IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02020-CBS

THOMAS RAMON GONZALEZ,

        Plaintiff,

v.

CAROLYN W. COLVIN,

        Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Craig B. Shaffer

      This action comes before the court pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33, 1381–83(c) for review of the Commissioner of Social Security's (the "Commissioner" or "Defendant") final decision denying Thomas Ramon Gonzalez's ("Plaintiff") application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff filed the Complaint on September 15, 2015, and the case was assigned to District Judge Wiley Y. Daniel. Doc. 1. On November 25, 2015, the parties consented to magistrate jurisdiction. Doc. 14. On February 2, 2016, pursuant to the parties' consent, 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2(e), this action was referred to this court for disposition. Docs. 19, 20. The court has carefully considered the Complaint, Plaintiff's Opening Brief (Doc. 16), Defendant's Response Brief (Doc. 17), Plaintiff's Reply (Doc. No. 18), the entire case file, the Social Security administrative record ("AR"), and the applicable law. Oral argument would not assist the court. For the following reasons, the court reverses the Commissioner's decision in part and remands for proceedings consistent with this opinion.

**BACKGROUND**

On October 25, 2012, Plaintiff filed an application for DBI and SSI, alleging a disability onset date of July 1, 2012. *See, e.g.,* AR at 186 (application summary dated as of November 8, 2012). Plaintiff alleged that his ability to work was limited by two physical conditions: going blind in the right eye and back problems. *Id.* at 237 (disability report of November 19, 2012). Plaintiff was born in January 1961 and was 51 years old on the date of his alleged disability onset. *Id.* at 183. He completed the 10th grade and previously worked in several occupations, the most recent being a groundsman for a tree service. *Id.* at 279-80. After his initial application was denied on January 28, 2013, the record reflects the appointment of Andrew S. Youngman as a non-attorney representative for Plaintiff. AR at 102-03. Through Mr. Youngman, Plaintiff requested an administrative law judge ("ALJ") hearing, filed a new disability report, and filed three briefs. AR at 102-05, 327-334, 345-57. Plaintiff's new disability report asserted that he had developed mental or emotional disabilities. AR at 328. He noted outpatient treatment for bipolar disorder, severe depression and short term memory issues. *Id.* at 329. The ALJ held the hearing on July 22, 2014. *Id.* at 28-70.

On the day of the hearing, Brian Grayson entered his appearance as an attorney for Plaintiff and questioned the witnesses. AR at 181-82. A consultative mental health expert, Kent B. Layton, Psy.D, testified first. Dr. Layton testified that Plaintiff has diagnoses of dysthymia (depression), antisocial personality disorder, anxiety disorder, and "rule out" borderline intellectual functioning. AR at 35-36. In Dr. Layton's opinion, Plaintiff's impairments resulted in a mild limitation in social functioning, "but could get as much as moderate because he does have that dysthymia. … His difficulties with concentration, persistence, and pace are moderate. He has borderline intelligence. I didn't see any extended decompensation as well." AR at 36-37. Dr.

Layton further opined that Plaintiff would "have [sic] remembering detailed instructions, moderate difficulty. He would have—potentially concentration for extended periods would be moderate. … [S]imple, repetitive, nonpublic, or minimum public, minimum public. No problem with supervisors, and minimum contact with coworkers." *Id*. Dr. Layton testified that Plaintiff could tolerate "occasional and superficial … interaction with the general public and coworkers[,] and routine workplace changes." *Id.* at 38. He summarized the opinions in Plaintiff's file from other professionals and why he agreed or disagreed with those opinions. *Id.* at 38-40.

Plaintiff testified regarding the physical and mental conditions that he alleged cause him to be disabled, his daily life activities, his education level, when he had last worked, why his work ended, and when he had last sought work. *Id.* at 44-56.

A vocational expert ("VE"), Douglas Prutting, then testified based on his review of Plaintiff's occupational history in the file. Plaintiff's past work as a groundsman corresponded to DOT (Dictionary of Occupational Titles) 408.687-014 and was classified as a heavy job. AR at 60. The ALJ asked the VE to assume hypothetically:

> a person who is about the claimant's age of 53, who has a limited education in that he only attended school to the tenth grade, and has no GED, and the vocational profile that includes groundsman. And if this hypothetical person is able to occasionally lift and/or carry up to 20 pounds, and frequently lift and/or carry up to 10 pounds; has no other exertional or physical limitation; and is able to understand and remember simple instructions that can be learned and mastered within a 30-day period; can sustain concentration, persistence, and pace for these instruction in a low-stress environment, with low stress defined as can tolerate occasional and superficial interactions with both the general public and coworkers; and in this environment, is able to tolerate supervision, routine work changes, can plan and set simple goals, can travel, and can recognize and avoid work hazards.

AR at 60. The VE testified that an individual with those limitations could not perform the work involved in Plaintiff's previous job. *Id.* at 61. The VE, however, also testified that the

3

hypothetical person could perform other occupations. *Id.* The VE identified three examples of light work that such a person could do: construction flagger, cashier II, and small products assembler. *Id.* at 61-62. The VE estimated the numbers of each job existing nationally and in the state of Colorado.

On August 1, 2014, the ALJ issued her decision denying benefits. AR at 12-27. The ALJ's opinion followed the five-step process outlined in the Social Security regulations.[1] At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since July 1, 2012, the alleged onset date. *Id*. at 14. At step two, the ALJ found that Plaintiff's "(1) Degenerative joint disease of the right wrist; (2) Dysthymia; (3) Anti-social personality disorder; and (4) Rule out borderline intellectual functioning" constituted severe impairments. *Id*. She further concluded that although Plaintiff alleged other complaints, they did not constitute severe impairments: Plaintiff alleged 75% blindness in his right eye, but his eye exam showed he has correctable vision to almost 20/20; back pain, but his x-ray showed no abnormality; knee pain but an MRI showed only conditions for which there was "no persuasive evidence that this impairment will cause limitations that will last for a consecutive 12 month period;" hypertension, headaches, and allergic rhinitis, but had no diagnostic evidence of head or brain abnormalities, reported in April 2014 not having severe headaches any longer, and although he has been treated for rhinitis and hypertension, there were "no persuasive clinical findings that support" ongoing limitations due to these conditions. AR at 14-15. At step three, the ALJ found that Plaintiff did not have an impairment that met or medically equaled a "listed" impairment, *i.e.,* an impairment the Commissioner identifies in the regulations as disabling with no need for further analysis. *Id*. at 15-16. The ALJ then assessed the following residual functional capacity ("RFC"):

---

[1] The five-step process for DIB and SSI applications is defined in 20 C.F.R. §§ 404.1520, 416.920. The court discusses the five steps in more detail below.

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can lift and/or carry up to 20 pounds occasionally and 10 up to pounds frequently; and can understand and remember simple instructions that can be learned and mastered in up to 30 days; can sustain concentration, persistence, and pace for these instructions in a low stress environment (defined as can tolerate only occasionally and superficial interactions with coworkers and the general public[)]; and in this environment can tolerate supervisions; tolerate routine work changes; plan and set simple goals; can travel; and can recognize and avoid work hazards.

AR at 16.

In determining Plaintiff's RFC, the ALJ followed a two-step process, first determining whether Plaintiff had an "underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms" and second, if the ALJ found such an impairment, the ALJ "evaluate[d] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." AR at 17.

> The claimant is unable to work due to extreme anger, depression and pain. He lives with a roommate who helps him with daily activities. The claimant likes to collect Hot Wheels cars, and collects older ones dating back to the 1960's. When he is depressed, he attends to his Hot Wheels. The claimant's last job as a security guard ended because he could not get along with co-workers. The claimant has a steel plate in his right hand. The claimant spends his free time watching television shows. The claimant was often made fun of while working, which caused him a great deal of irritation and anger. He has always had problems getting along with coworkers.

AR at 17. The ALJ noted that Plaintiff's medical records established that

> the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and

> limiting effects of these symptoms are not entirely credible for the
> reasons explained in this decision.

*Id.* The ALJ summarized the record as to each condition that Plaintiff asserted in the record, citing Plaintiff's hearing testimony, medical records, and expert opinion evidence. *Id.* at 17-21. Specifically, as to the conditions Plaintiff argues on appeal, the ALJ discussed several records of office visits for mental or medical treatments that reflected Plaintiff's daily activities, functioning, mood and appearance; the ALJ also discussed the opinions of Dr. Layton; physician's assistant Manda Sloan; Margaret Kaems, LCSW; consultative examiner Thomas Corsolini, M.D.; Candace Jones, LCSW; June Worthington, D.O.; and state agency psychologist Kenneth Bowles, PhD. The ALJ concluded that the above residual functional capacity assessment was supported by the objective diagnostic evidence, the claimant's treatment history and exam findings, his activities of daily living, the opinion of Dr. Layton, and the record as a whole. AR at 21.

At step four, based on Plaintiff's RFC, the ALJ found that Plaintiff could not perform any past relevant work. *Id.* at 21. At step five, the ALJ found: "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* Relying on the VE's testimony, the ALJ found that Plaintiff is not disabled because he is capable of light, unskilled jobs existing in significant numbers nationally and within the state, such as "construction flagger, DOT 372.667-022…, 38,000 in the country and 46 in the state; cashier II, DOT 211.462-010 … with 1,700,000 and 22,000 in the state; and assembler of small products, DOT 706.684-022, … with 150,000 in the country and 1,950 in the state." AR at 22. Based on this conclusion at step 5, the ALJ denied Plaintiff's applications for DIB and SSI.

Plaintiff requested that the Appeals Council review the ALJ's decision, and the Appeals Council denied his request on July 16, 2015. AR at 1. The decision of the ALJ then became the final decision of the Commissioner. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481. Plaintiff timely filed this action on September 15, 2015. Doc. 1. The court, as the "district court of the United States for the judicial district in which the plaintiff resides" has jurisdiction to review the final decision of the Commissioner.  42 U.S.C. §§ 405(g), 1383(c)(3).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole. *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Angel v. Barnhart,* 329 F.3d 1208, 1209 (10th Cir. 2003). The court may not reverse an ALJ simply because it may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in his decision. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted). Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted). Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial

evidence." *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation

omitted).

> A person is disabled within the meaning of the Social Security Act
> only if his physical and/or mental impairments preclude him from
> performing both his previous work and any other "substantial
> gainful work which exists in the national economy." 42 U.S.C. §
> 423(d)(2) [and 42 U.S.C. § 1382c(a)(3)(B)]. "When a claimant has
> one or more severe impairments the Social Security [Act] requires
> the [Commissioner] to consider the combined effects of the
> impairments in making a disability determination." …. However,
> the mere existence of a severe impairment or combination of
> impairments does not require a finding that an individual is
> disabled within the meaning of the Social Security Act. To be
> disabling, the claimant's condition must be so functionally limiting
> as to preclude any substantial gainful activity for at least twelve
> consecutive months.

*Wilson v. Astrue,* No. 10-cv-00675-REB, 2011 WL 97234, at *1 (D. Colo. Jan. 12, 2011)

(quoting *Campbell v. Bowen,* 822 F.2d 1518, 1521 (10th Cir. 1987)).

The Commissioner's regulations define a five-step process for determining whether a

claimant is disabled:

> 1. The ALJ must first ascertain whether the claimant is engaged in
> substantial gainful activity. A claimant who is working is not
> disabled regardless of the medical findings.

> 2. The ALJ must then determine whether the claimed impairment
> is "severe." A "severe impairment" must significantly limit the
> claimant's physical or mental ability to do basic work activities.

> 3. The ALJ must then determine if the impairment meets or equals
> in severity certain impairments described in Appendix 1 of the
> regulations.

> 4. If the claimant's impairment does not meet or equal a listed
> impairment, the ALJ must determine whether the claimant can
> perform his past work despite any limitations.

> 5. If the claimant does not have the residual functional capacity to
> perform her past work, the ALJ must decide whether the claimant
> can perform any other gainful and substantial work in the

> economy. This determination is made on the basis of the claimant's
> age, education, work experience, and residual functional capacity.

*Wilson,* 2011 WL 97234, at *2 (citing 20 C.F.R. § 404.1520(b)-(f)); *see also* 20 C.F.R §

416.920;[2] *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988). After the third step, the

ALJ is required to assess the claimant's residual functional capacity. 20 C.F.R. § 416.920(e). The

claimant has the burden of proof in steps one through four; the Commissioner bears the burden

of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

### ANALYSIS

On appeal, Plaintiff argues that the ALJ erred in (a) not considering his use of a service

dog as a limitation on the jobs that he can perform; (b) giving little weight to the opinions of

treating professionals; and (c) not developing the record regarding Plaintiff's intellectual

functioning.

A.      Need for a Service Dog.

Plaintiff argues the ALJ erred in not considering his need for a service dog in determining

his RFC. The record reflects the following evidence relating to Plaintiff's service dog. On July 2,

2013, Ms. Sloan, a physician's assistant at Axis Health Systems, prescribed Plaintiff a service

animal to assist with an intracranial head injury of unspecified nature, anxiety and depression.

AR at 410. Shortly thereafter, he obtained his service dog. AR at 415, 437. Plaintiff's July 25,

2013 treatment records reflect "playing with my dog" as one of Plaintiff's reported "self-help"s

for anxiety and depression. AR at 422, 429. On August 21, 2013, he reported to Ms. Sloan:

> [H]is depression is a little better. … His little dog is doing great.
> He is enjoying him a lot. His name is Oscar. His dog is getting him

---

[2] "Part 404 of Title 20 of the Code of Federal Regulations … contain[s] the Commissioner's regulations relating to disability insurance benefits[;] identical, parallel regulations can be found in Part 416 of that same title, relating to supplemental security income benefits." *Wilson,* 2011 WL 97234 at n.2.

> outside. … No longer wearing sweat pants all day.  Getting outside
> taking a lot of walks with his little dog. Meeting people."

AR at 437.  Regarding this office visit, Ms. Sloan noted *inter alia*:

> [Plaintiff's] appearance was normal, the grooming was normal. He
> was not wearing sweats today. He had on normal black pants, and
> the behavior demonstrated no negativism improved today from
> prior exams. The attitude was not abnormal. He had a great deal
> more positive things to say today compared to prior visits and was
> cooperative. The mood was concerned. The mood was not angry.
> Great improvement in this area. … The affect was proud. He does
> not mention any fighting today with anyone.

*Id.* at 439. On the same date, Katrina Lennex, LCSW noted: "Pt reporting he is doing better

partly because of his Service Dog's companionship. Pt requesting therapy now that he can afford

it since having Medicaid. Pt requesting assistance with coping skills, grief and anxiety." *Id.* at

522. After August 21, 2013, Plaintiff's treatment records appear to mention Plaintiff's dog only

in passing. AR at 420 (Sep. 9, 2013), 433 (Sep. 11, 2013), 465 (March 6, 2014).[3]

     In his prehearing brief, Plaintiff argued that his service dog was one of several facts

showing he met Listed Impairment 12.04 (affective disorders). AR at 349 (dated March 6, 2014).

However, Plaintiff did not argue that he needed his service dog at work. *Id.* at 351-52. At the

July 2014 hearing, Dr. Layton testified that Plaintiff has diagnoses of dysthymia (depression),

anxiety and antisocial personality disorder. AR at 35. These are the conditions for which Plaintiff

was prescribed the service dog. AR at 410. But Dr. Layton was not asked whether Plaintiff

would likely need his service dog to be able to work, and Dr. Layton did not mention whether the

service dog factored into his opinions that Plaintiff's mental RFC and social functioning were

only mildly to moderately limited. AR at 34-44. In the ALJ's decision, the ALJ recites that

---

[3] Plaintiff's first mental RFC assessment (by Ms. Jones, LCSW) predated Plaintiff's service dog by
several months and accordingly does not mention it. AR at 373-377 (dated April 5, 2013). Plaintiff's
physical ability assessment and mental health questionnaire post-date the service dog prescription but the
forms do not ask the providers to describe treatments or therapies. AR at 453-57, 459-460, 474-76.

Plaintiff received the following mental health treatment or therapies: individual therapy, prescription medication, and several office visits to Axis Health. AR at 18. The ALJ's decision does not mention Plaintiff's service dog, but in noting "these modalities appear somewhat successful" (*Id.*), the ALJ cites the August 21, 2013 medical records that noted the service dog as part of Plaintiff's improved daily activity functioning. AR at 437-440.

Plaintiff is not entirely consistent in how he believes his use of a prescription service dog shows the ALJ erred. On the one hand, Plaintiff argues that his service dog is an "accommodation," and the Commissioner cannot consider accommodations in making disability determinations. Opening Br. at 3. Plaintiff cites *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795 (1999) and SSR00-1c, Sections 222(c) and 223(a), (d)(2) (a), and (e)(1) of the Social Security Act (42 U.S.C. 422(c) and 423(a), (d)(2)(A), and (e)(1)) Disability Insurance Benefits—Claims Filed Under Both the Social Security Act and the Americans with Disabilities Act (SSA Jan. 7, 2000), https://www.ssa.gov/OP_Home/rulings/di/01/SSR2000-01-di-01.html. These authorities hold that in determining whether a claimant is disabled for purposes of DIB or SSI, the Commissioner cannot consider ADA accommodations that the claimant received in previous work (or claimed that he or she should receive). Here, Plaintiff never claimed or received a workplace accommodation for his service dog. He had stopped working in 2011 and was not prescribed a service dog until July 2013. After Plaintiff lost his last position, he had neither been employed nor sought employment. AR at 52. Accordingly, SSR00-1c and *Cleveland* are inapposite.

Plaintiff's second argument is that his use of a service dog is a limitation that the ALJ should have reflected in the RFC and hypothetical to the VE. Plaintiff cites *Santos v. Colvin*, No. 3:12-cv-05827-KLS, 2013 WL 5176846, at *1–2 (W.D. Wash. Sept. 12, 2013), in which the

claimant used a service dog, and the ALJ did not include that in the claimant's RFC. The court found that the Commissioner erred in "failing to properly consider the vocational impact of plaintiff's use of a service dog." *Santos*, 2013 WL 5176846, at *2. *See also Santos v. Colvin,* 2014 WL 108195, at *4 (W.D. Wash. Jan. 9, 2014) (finding this was a "basic and fundamental" error). In *Loree v. Colvin,* No. 2:15-cv-251-JMC, 2016 WL 5107028, at *1–2, 4 (D. Vt. Sept. 20, 2016), the claimant argued that the Commissioner should have considered claimant's use of a "service dog to help with his anxiety and other PTSD symptoms" as a limitation on his ability to work. The court did not reach that issue, finding remand necessary because the Commissioner gave no weight to the Veterans Administration's finding of 90% service-connected disability. In at least one reported case, the Commissioner has included a service dog as a limitation in the claimant's RFC. *Hilt-Hayden v. Comm'r, Soc. Sec. Admin.,* No. 6:15-cv-00258-HZ, 2016 WL 3396937, at *4 (D. Or. June 14, 2016) (RFC included that "claimant must work in an environment where a service dog … [is] allowed"). The service dog limitation was not at issue on appeal in *Hilt-Hayden*.

Defendant recognizes that Plaintiff uses a prescription service dog (Response Br. at 4), but argues that until this appeal, Plaintiff did not claim he needed the service dog for work. Defendant believes that Plaintiff should not be permitted to raise the argument now, particularly without "put[ting] forth any evidence showing that he could not perform the jobs identified by the [VE]." Response Br. at 10, n.6. Defendant is correct that none of the medical opinions postdating[4] the service dog prescription indicate that Plaintiff needs a service dog while at work. No one mentioned the service dog at the hearing. None of Plaintiff's briefs in the administrative proceeding argued that he needed his service dog at work. There is a total lack of evidence

---

[4] Defendant's citation to records predating the July 2013 service dog prescription is unpersuasive. Response Br. at 9-10.

regarding the significance of the service dog for Plaintiff's RFC and ability to perform the specific jobs that the ALJ found exist in significant numbers.

"[T]he ALJ [is] responsible in every case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) (internal quotation marks omitted). *See also* 20 C.F.R. § 416.1444 (requiring the ALJ to "look[ ] fully into the issues").

> The RFC assessment must be based on *all* of the relevant evidence in the case record[, including] Medical history; * * * [and t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication).

SSR96-08 (emphasis original), Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims (SSA July 2, 1996), https://www.ssa.gov/OP_Home/rulings/di/01/SSR96-08-di-01.html. This duty applies at every step. *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999).

"[I]n a counseled case, the ALJ may ordinarily require counsel to identify the issue … requiring further development" and the ALJ has a duty to develop issues only when the "need [for such development] … is clearly established in the record." *Hawkins*, 113 F.3d 1162, 1168 (10th Cir. 1997). Defendant's cited cases hold the same. *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004); *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008). Applying this doctrine is somewhat complex in this case. In the court's research, cases that permit the ALJ to rely on a represented claimant to frame the issues and to request further development where necessary all involve claimants represented by attorneys. *See, e.g., Branum,* 385 F.3d at 1271-72; *Maes*, 522 F.3d at 1097; *Hawkins*, 113 F.3d at 1167-68; *Glass v. Shalala*, 43 F.3d 1392, 1394–95 (10th Cir. 1994); *Jazvin v. Colvin*, No. 15-1498, 2016 WL 4466732, at *1–3 (10th Cir. Aug. 24,

2016). Prior to the ALJ hearing, Plaintiff was represented only by a non-attorney. AR at 102-03; 181-82. All of Plaintiff's written submissions in the administrative proceeding from March 2013 forward were signed only by his non-attorney representative. AR at 7-8, 104-05, 327-34, 345-357. The court is circumspect of permitting the ALJ to rely on non-attorney representatives to frame the issues, particularly when the parties have not briefed this issue directly.

However, the court finds that it need not resolve what level of responsibility a non-attorney representative has for developing the issues because in this case the need for further development of whether Plaintiff needs his service dog to work was "clearly established" in the medical records. In explaining why she found Plaintiff's dysthymia and antisocial personality disorder did not prevent Plaintiff working, the ALJ specifically pointed to the August 21, 2013 records that discuss Plaintiff's use of his service dog. AR at 18. Based in part on the improvement noted in those records, the ALJ formulated the hypothetical to the VE and Plaintiff's RFC as permitting him to tolerate "occasional[] and superficial interactions with coworkers and the general public; … supervisions … [and] routine work changes," but did not include a need for the work environment to permit service dogs. *Id* at 16; 60.

The July 2013 prescription, August 21, 2013 records and Plaintiff's March 2014 brief clearly established the  need to develop evidence regarding whether Plaintiff's prescription service dog is a limitation on his ability to perform work existing in significant numbers. The ALJ had a duty to look at whether the service dog was a "mechanics of treatment" that would affect Plaintiff's RFC and the jobs that he can perform. SSR96-08. But nothing in the record addresses whether Plaintiff needs the service dog to work; whether this would limit his ability to perform light, unskilled work in general; or whether adding the service dog requirement would cause the three representative jobs (construction flagger, cashier II, and small products

assembler) to not exist in significant numbers. This lack of record evidence causes the ALJ's finding that Plaintiff can perform work existing in significant numbers to be unsupported by substantial evidence. *See, e.g., Fleetwood v. Barnhart,* 211 F. App'x 736, 739–740 (10th Cir. 2007) (given the lack of evidence directly addressing the claimant's RFC, "the ALJ made unsupported findings concerning her functional abilities.").

To avoid remand, Defendant argues that Plaintiff had the burden of proving disability. But this issue regards the step five finding, on which the Commissioner bears the burden of proof. *Lax*, 489 F.3d at 1084. Although it is unfortunate that Plaintiff did not raise this issue in the hearing so that the ALJ could address it, Plaintiff is not barred from raising the issue on this appeal. *Hackett v. Barnhart,* 395 F.3d 1168, 1176 (10th Cir. 2005). The court accordingly finds a limited remand is necessary for further proceedings on this issue.

Plaintiff further argues that the ALJ erred in finding his reported levels of limitations not entirely credible because he walks his service dog. The ALJ found:

> the claimant told his provider in August 2013 that he was meeting new people, walking his dog, and spending time with his grandchildren. Exh. 7F, p. 33. While these activities do not, ipso facto, demonstrate an ability to engage in sustained work activity, they do suggest a far greater ability to function than the degree of [back and wrist] pain and anxiety alleged by the claimant would suggest. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

AR at 19. This finding regards three facts in unison: in August 2013, Plaintiff was meeting new people, walking his dog and spending time with grandchildren. The ALJ found all three together were inconsistent with Plaintiff's reported levels of three different conditions: back pain, wrist pain, and anxiety. Although the ALJ could have been more precise in delineating how each of the three activities was inconsistent with each alleged condition, the court finds no reversible

error. The ALJ did not find these daily activities sufficient in themselves to find Plaintiff not disabled or for instance sufficient to overrule treating physicians' opinions. *See, e.g., Vaupell v. Astrue,* No. Civ. S-10-0022 EFB, 2011 WL 675359, at *6 (E.D. Cal. Feb. 16, 2011)). The court has reviewed the record, and the ALJ's finding is supported by substantial evidence regardless of whether she meant Plaintiff's dog walking was inconsistent with reported back pain, wrist pain, anxiety, or some combination of the three conditions.

B.      Treating Professionals' Opinions.

Plaintiff argues that the ALJ erred in discounting the opinions of his treating professionals: June Worthington, D.O.; Candace Jones, LCSW; Manda Sloan, PA-C, Margaret Kaems, LCSW, and Joy Morris, PhD. The court reviews for error under the following standards.

> Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments including … symptoms, diagnosis and prognosis. … A treating physician's opinion about the nature and severity of claimant's impairments should be given controlling weight by the Commissioner if well supported by clinical and laboratory diagnostic techniques and if not inconsistent with other record evidence. … If an ALJ decides not to give controlling weight to a treating physician opinion, the ALJ must give reasons for the weight which she gives the treating source.

*Hollinger v. Colvin,* No. Civ.A. 13-1468-KHV, 2015 WL 2449581, at *6 (D. Kan. May 22, 2015) (citing *Watkins v. Barnhart,* 350 F.3d 1297, 1300–01 (10th Cir. 2003); *Newbold v. Colvin,* 718 F.3d 1257, 1265 (10th Cir. 2013)).

> Even if an opinion of a treating medical source is not entitled to controlling weight, the ALJ must weigh the opinion in light of the factors set forth at 20 C.F.R. § 404.1527. *Id.* Those factors are as follows: (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the source's opinion is supported by relevant evidence; (4) consistency

between the opinion and the record as a whole; (5) whether the source is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ attention which tend to support or contradict the opinion.

*Hollinger,* 2015 WL 2449581, at *6 (citing *Watkins,* 350 F.3d at 1301; 20 C.F.R. §§ 404.1527(d)(2–6), 416.927(c)(2–6)).

The ALJ's decision identifies good reasons for giving little weight to the opinions of Ms. Sloan, Ms. Kaems, Ms. Jones, and Dr. Worthington regarding the severity of Plaintiff's impairments: they were "not consistent with the claimant's exam findings, his treatment history, or the opinion of [the reviewing mental health expert] Dr. Layton for reasons he explained." AR at 19-20.[5] Although the ALJ's explanation is terse and does not mention each factor from the rule, it must be read in connection with the analysis of claimant's exam findings and treatment history that precedes it. *Id.* at 17-19. The ALJ spent over two single-spaced pages summarizing Plaintiff's exam findings and treatment history, citing and quoting several exam findings that Plaintiff's social functioning was sufficient for occasional contact with coworkers and the public:

> [T]he claimant reported in August 2013 that he was feeling better, waking up earlier, and meeting people. Exh. 7F, pp. 33- 35. His provider stated that the claimant was "doing great" Exh. 7F, p. 36. Obviously, this is not indicative of all the claimant's treatment sessions, many of which document ongoing depression. However, it does suggest that the claimant's treatment has been somewhat successful in treating his symptoms.
> The claimant's mental status exams have revealed depressed mood, diminished eye contact, tangential thinking, pressured and rapid speech, anhedonia, and a "proud" and/or angry affect. Exh. 7F, pp. 2, 9, 13, 15; Exh. 12F, p. 5; Exh. 14F, pp. 23, 31; Exh. 1 5F, pp. 22, 226, 28, 30, 32, 34, 36, 47. However, the claimant has also been noted to be appropriate hygiene, dress, and grooming. Almost all the aforementioned exams have noted that

---

[5] Dr. Morris did not provide an opinion for disability purposes. Rather, Plaintiff cites Dr. Morris's treatment record (AR at 412) planning Plaintiff's therapy in which Dr. Morris assigned Plaintiff a "GAF" (Global Assessment Functioning) of 50. The ALJ gave good reasons for why she gave little weight to this (and other) GAF ratings. AR at 20, citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (4th Ed. 1994) and 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000).

> the claimant is cooperative despite his anger. Some exams have
> also noted euthymic affect. Exh. 7F, p. 35; Exh. 1 5F, p. 22. Many
> have noted normal eye contact and speech as well. Exh. 7F, p. 35;
> Exh. 12F, p. 3; Exh. 1 5F, pp. 24, 28, 30, 32, 34, 36, 47; Exh. 16F,
> p. 20.

AR at 18. The court has reviewed the cited exhibits, and they substantially support the ALJ's

findings. The ALJ further explained why she found Dr. Layton's opinions carried more weight

than the treating providers:

> [He] is an expert in psychology and knows the agency's rules,
> regulations and definitions regarding the disability process.  His
> opinion was rendered after a thorough review of the entire medical
> file. He persuasively explained the basis for his opinions, as well
> as explained why he was not persuaded by contrary evidence.
> Overall, his opinion [w]as consistent with the record as a whole.

*Id.* at 19. This is supported by substantial evidence. *See, e.g., Id.* at 35-41 (Dr. Layton's hearing

testimony); 144-47 (Dr. Layton's professional qualifications). 20 C.F.R. § 404.1527 requires

only good reasons for giving treating medical opinions less weight, not every possible reason.

The ALJ gave good reasons in this case.

Plaintiff argues nonetheless that the ALJ should have given more weight to "Dr.

Worthington's and Ms. Jones' longitudinal treating relationships with" Plaintiff. Opening Br. at

11. The ALJ's decision does not mention it, but there appears to be only one record of Dr.

Worthington treating Plaintiff before she agreed with the opinions given by Ms. Sloan and Ms.

Kaems. AR at 465 (March 6, 2014); 476 (March 11, 2014 signature in reviewing impairment

questionnaire). Dr. Worthington noted "I have seen this pt twice prior to this visit only." AR at

562 (March 11. 2014 office visit). This is not a treating relationship of significant longitude. *See,

e.g., Branum*, 385 F.3d at 1275 (ALJ did not err in rejecting opinion of physician who treated

claimant twice).

18

Regarding Ms. Jones, LCSW, the ALJ did not err in giving Ms. Jones' opinion little weight. Even assuming that a licensed clinical social worker were an "acceptable medical source" and thus entitled to controlling weight if consistent with the record, the ALJ cited to the handful of records from Ms. Jones' treatment of Plaintiff. AR at 18 (citing Ex. 14F, AR 477-501). The record reflects that Ms. Jones treated Plaintiff four times between February 1, 2013 and April 5, 2013. AR at 477, 482, 496, 501. Ms. Jones gave a mental RFC assessment (*Id.* at 373-77) on the same day as the fourth and final treatment. In it, she opined that Plaintiff had marked difficulties in social functioning and periods of deterioration or decompensation. *Id.* at 375. A two month professional relationship is short enough that the Commissioner can consider it an examining, non-treating relationship such that the provider's opinion is entitled to less weight. *See, e.g., Crowder v. Colvin,* 561 F. App'x 740, 743 (10th Cir. 2014) (ALJ should have weighed a licensed, Ph.D. psychologist's opinion as examining provider). The ALJ found Ms. Jones' April 2013 opinion was not supported by the exam findings and treatment history; this is supported by substantial evidence that between June 2013 and July 2014, Plaintiff often had periods of improvement. *Id.* at 437-440, 522, 541-42. Moreover, as an LCSW, Ms. Jones was an "other source" whose opinion the ALJ correctly considered regarding the severity of alleged impairments, but was not entitled to controlling weight. 20 C.F.R. §§ 404.1502, 1513(d), 1527(d); *Crowder,* 561 F. App'x at 744. In short, the ALJ did not err in giving little weight to the opinions of Plaintiffs' treating professionals.

C.      Intellectual Ability.

Plaintiff argues that the ALJ should have developed the record regarding Plaintiff's "rule out borderline intellectual functioning." Opening Br. at 4-5. Specifically, Plaintiff argues that the ALJ should have ordered an IQ test for Plaintiff to ascertain at step three whether Plaintiff's

intellectual functioning met the requirements of Listing 12.05. Opening Br. at 5; Reply Br. at 4-

5. Listing 12.05 provides:

> Intellectual disability: Intellectual disability refers to
> significantly subaverage general intellectual functioning with
> deficits in adaptive functioning initially manifested during the
> developmental period; i.e., the evidence demonstrates or supports
> onset of the impairment before age 22.
>         The required level of severity for this disorder is met when
> the requirements in A, B, C, or D are satisfied.

20 C.F.R. § Pt. 404, Subpt. P, App. 1. Plaintiff focuses on Paragraphs B, C and D[6] of Listing

12.05 which each require levels of severity in intellectual disability measured by numeric ratings

of the claimant's IQ that fall below 71. *Id.* However, the preliminary requirement is that

Plaintiff's "deficits in adaptive functioning initially manifested during the developmental period;

*i.e.,* the evidence demonstrates or supports onset of the impairment before age 22." *Id.* Plaintiff

does not point to any evidence demonstrating or supporting onset of intellectual disability before

age 22. As discussed in more detail below, Plaintiff gave directly conflicting reports to his

providers regarding whether he had been in special education as a child. Nonetheless, the court

will assume that if the ALJ had further developed the record, there may be support that Plaintiff

had a deficit in adaptive functioning before the age of 22. If Plaintiff had an intellectual disability

meeting Listing 12.05, he would have been found disabled at step three.

Plaintiff's argument is not persuasive. Unlike the issue of whether Plaintiff can perform

work existing in significant numbers, this is a disability issue on which Plaintiff bears the burden

of proof. *Lax*, 489 F.3d at 1084. "ALJs are not required to 'exhaust every possible line of inquiry

in an attempt to pursue every potential line of questioning. The standard is one of reasonable

good judgment.'" *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009) (quoting *Hawkins,* 113

---

[6] Plaintiff does not specify which paragraphs of Listing 12.05 may apply, but appears to limit his
argument to Paragraphs B, C and D. Paragraph A requires impairments that Plaintiff does not contend
exist here and does not require an IQ test.

F.3d at 1168). The ALJ's duty "is not a panacea for claimants… which requires reversal in any matter where the ALJ fails to exhaust every potential line of questioning." *Glass*, 43 F.3d at 1396. The ALJ has a duty to develop the record only as "consistent with the issues raised." *Hawkins*, 113 F.3d at 1164. "[T]he ALJ is not required to act as the claimant's advocate in order to meet his duty to develop the record." *Maes*, 522 F.3d at 1097. Thus, for the ALJ to be on notice to develop evidence regarding Plaintiff's IQ or Listing 12.05, Plaintiff had to sufficiently raise an issue of intellectual disability.

In Plaintiff's original application, he did not allege mental disabilities of any kind. AR at 232-249 (application); 44 (hearing testimony). When Plaintiff requested the ALJ hearing, he did not allege an intellectual impairment or disability. *Id.* at 104-05, 327-334. Although at the hearing Plaintiff's representative asked him to specifically describe his physical impairments, he did not ask Plaintiff to describe any intellectual or cognitive difficulties. *Id.* at 54-56. Nor do the medical records raise a clear issue regarding Plaintiff's intellectual functioning. Some of Plaintiff's providers estimated or suspected borderline intellectual functioning (*Id.* at 416, 417, 422, 456), and he had reported past head injuries. *Id.* at 499. However, a mental status examination dated July 25, 2013 estimated that he had an "average fund of knowledge." *Id.* at 427. In one treatment record, he reported he had been in special education, but in another he reported just the opposite. *Id.* at 406, 238. In his work history, Plaintiff identified 22 different types of jobs. *Id.* at 279-280. *Cf., Wall,* 561 F.3d at 1061. Plaintiff did not allege that he had to stop working due to intellectual or cognitive difficulty. He also did not allege any recent change in his intellectual functioning. AR at 327-334. In requesting the hearing, Plaintiff stated that he did not have additional evidence to present. *Id.* at 104. He also did not provide any evidence after the Commissioner notified his representative to submit any evidence that Plaintiff wanted the

ALJ to consider. AR at 106-07. In short, the record does not reflect that Plaintiff sufficiently raised the issue of intellectual impairment; the ALJ did not commit reversible error in not obtaining an IQ test for Plaintiff and not expressly considering Listing 12.05.[7] *See, e.g., Wall,* 561 F.3d at 1061-62.

Plaintiff argues that without further development, "there is simply no way to know whether the ALJ's RFC for 'simple, repetitive tasks' addresses the impact of Plaintiff's borderline intellectual functioning, since the impact of this diagnosis was never evaluated in the first place." Reply Br. at 4. This is unpersuasive. The ALJ included a limitation in Plaintiff's RFC to "light work … [involving] understand[ing] and remember[ing] simple instructions that can be learned and mastered in up to 30 days." AR at 16. The ALJ pointed to Dr. Layton's hearing testimony that Plaintiff "would have moderate difficulties following complex instructions, but could understand simple, repetitive instructions." *Id.* at 19. *See also Id.* at 37 (Dr. Layton's testimony). In the hypothetical to the VE, the ALJ included that the hypothetical person would have "a limited education in that he only attended school to the tenth grade, and has no GED … and is able to understand and remember simple instructions that can be learned and mastered within a 30-day period." *Id.* at 60.

A limitation to "simple instructions" has no meaning if it does not regard a claimant's intellectual or cognitive limitations. Tenth Circuit cases consistently interpret "simple, repetitive" in RFCs as referring to the intellectual, cognitive or reasoning simplicity of the work. *See, e.g., Hackett,* 395 F.3d at 1176; *Duran v. Astrue,* 654 F. Supp. 2d 1298, 1301–02 (D. Colo. 2009); *Gaskell v. Astrue,* No. 10-cv-01901-WYD, 2011 WL 4383103, at *12 n.4 (D. Colo. Sept. 20, 2011); *Monaghan v. Astrue,* No. 07–cv–02655–WYD, 2009 WL 1973513, at *12 (D. Colo. July

---

[7] The ALJ may have believed that she addressed all listings, but this is unclear: "Now, I know that you're familiar with the listings of the commissioner. Does the evidence support that the claimant either meets or equals any of the listings, specifically 12.04 or 12.08? A: No, Your Honor." AR at 36.

8, 2009). The court accordingly finds no reversible error in the ALJ failing to obtain an IQ test or other evidence regarding Plaintiff's intellectual functioning. However, Plaintiff is not prohibited from further developing the record regarding his intellectual functioning on remand. 20 C.F.R. § 416.1483 ("[a]ny issues relating to your claim may be considered by the administrative law judge whether or not they were raised in the administrative proceedings leading to the final decision in your case").

## CONCLUSION

Based on the foregoing, the Commissioner's decision is REVERSED IN PART and REMANDED for further proceedings consistent with this order.

DATED at Denver, Colorado, this 14th day of October, 2016.

BY THE COURT:


*s/ Craig B. Shaffer*
United States Magistrate Judge